IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No.: 2:17-301-RMG |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| RASHAUN JUDGE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Government's Response to Defendant's Motion to Reduce Sentence
Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant Rashaun Allen Judge ("Defendant") has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying in part on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. This Court should deny the motion with prejudice because the Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute. Specifically, the Defendant has no met his burden to demonstrate extraordinary and compelling reasons to warrant his release, and the § 3553(a) factors strongly weigh against his release. This Court should also deny the Defendant's alternative request for an order directing BOP to transfer him to home confinement.

**Factual Background**

On April 11, 2017, the federal grand jury in Charleston returned a three-count indictment charging the Defendant with knowingly, intentionally, and unlawfully possessing with intent to distribute a quantity of cocaine and a quantity of cocaine base in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C) (Count 1); knowingly possessing a firearm after having been convicted of a crime punishable by a term of imprisonment exceeding on year in violation of Title 18, United States Code, Section 922(g) (Count 2); and possessing a firearm in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c) (Count 3). On

October 23, 2017, the Defendant entered a guilty plea pursuant to a plea agreement in which the Defendant agreed to cooperate with the government and plead guilty to Count 3 in exchange for the dismissal of the remaining counts in the indictment. Under the terms of the plea agreement, the Defendant faced a mandatory minimum term of imprisonment of 25 years unless the government filed a motion for downward departure. Thereafter, the Defendant cooperated with DEA and FBI. However, he began to assert his innocence and contest his guilt for the underlying conduct.

On February 15, 2018, the Defendant filed a motion to relieve his counsel, claiming "ineffective assistance of counsel, lack of communication, and a conflict of interest." ECF No. 55. On March 12, 2018, the Court conducted a hearing on the Defendant's motion to relieve his attorney. At the conclusion of the hearing, the Court instructed the Defendant to notify the Court in writing of his decision to remove his attorney. ECF No. 59. On June 21, 2018, the Court conducted a second hearing on the matter, during which the Defendant instructed the Court that he intended to file a motion to withdraw his guilty plea. On June 29, 2018, the Defendant filed a pro se affidavit claiming to be a Moorish American. ECF No. 60. On July 19, 2018, the Defendant filed a motion to withdraw his guilty plea pursuant to Federal Rule of Criminal Procedure 11(e). ECF No. 61. In his motion, the Defendant claimed that during the change of plea hearing, he "effectively" entered a plea under *North Carolina v. Alford*, and that although he "believed there was substantial evidence relating to the incident for which he was indicted that he would likely be convicted at a trial," in the months following his guilty plea, he "has lost confidence in that decision and prefers to litigate his case for innocence before a jury of his peers." *Id.* Shortly before Judge Duffy retired, he granted the Defendant's motion to relieve his counsel but deferred ruling on the Defendant's motion to withdraw his guilty plea until the case was reassigned. ECF No. 69.

This Court assumed responsibility over the case on August 29, 2018 and appointed Cameron Blazer to serve as the Defendant's standby counsel. On September 25, 2018, the Court conducted a hearing on the Defendant's motion to withdraw his guilty plea. During that hearing, the Court directed the government to notify the Defendant as to whether he would obtain a downward departure. Thereafter, the government filed a proposed motion for downward departure.

2

ECF Nos. 81 & 82. Despite the government's submission, the Defendant refused to withdraw his motion to set aside his guilty plea and continued to assert his innocence. In light of the Defendant's inconceivable positions, the government filed a motion for a psychiatric examination. ECF No. 86. The Court ordered a psychiatric evaluation on October 18, 2018. ECF No. 89.

After the Defendant's return to the district, the Court held a status conference on March 14, 2019. During the status conference, the Court prompted the government to extend an 11(c)(1)(C) plea offer to the Defendant. Thereafter, the government offered the Defendant an 11(c)(1)(C) plea to 180 months, representing a 10-year reduction from the statutory mandatory minimum. The Defendant rejected the government's offer and continued to assert his innocence on the underlying charges and express his desire to withdraw his guilty plea. The Court denied the Defendant's motion to withdraw his guilty plea and held that the government represented to the Court that the Defendant earned a downward departure motion and enforced the motion.

On June 18, 2019, this Court sentenced the Defendant to 120 months of imprisonment. The Defendant has served approximately 3 years of that sentence. He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons ("BOP"), relying on the threat posed by the COVID-19 pandemic. The Defendant makes numerous claims in his motion, including that he recently suffered a mild heart attack and has a history of heart failure and recently tested positive for COVID-19. The Defendant argues that his medical conditions put him at a higher risk of severe complications from COVID-19 which warrant his release. He makes an alternative request for home confinement.

## I.    BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General

5

directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 7,662 inmates to home confinement. *See* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors,

including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.     Defendant's Conviction and Request for a Sentence Reduction

On September 1, 2020, the Defendant filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that his medical ailments might put him at an increased risk of a severe outcome from COVID-19, specifically that he suffers from heart failure and chronic heart disease which create extraordinary and compelling reasons for his release. As fully set forth below, a review of the medical records reveals that the Defendant does not suffer from a terminal illness, nor does he suffer from a serious physical condition that substantially diminishes his ability to provide self-care within the environment of a correctional facility and from which he or is not expected to recover. USSG 1B1.13, cmt. n.1(A). Moreover, the Defendant is a danger to the community, and the § 3553(a) factors weigh strongly against his release. Therefore, the Court should deny his motion.

### Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds,

7

as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## Arguments

This Court should deny the Defendant's motion for a reduction in his sentence with prejudice on either of two independently sufficient grounds. First, the Defendant has not established that "extraordinary and compelling reasons" support a sentence reduction; second, the Defendant has not met his burden to show that a reduction is warranted in light of the danger that the Defendant would pose to the community and the relevant § 3553(a) factors. In addition, this Court lacks statutory authority to grant the Defendant's alternative request to direct BOP to transfer him to home confinement.[2]

### A.  The Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

The Defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

---

[2] As evidenced by the documents attached to his motion and documentation obtained from BOP, the government concedes that the Defendant has exhausted his administrative remedies as required under the statute. The Defendant requested compassionate release, and the BOP denied his request on July 30, 2020.

9

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[3] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy

---

[3] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

First, Defendant has not provided sufficient documentation for his asserted medical conditions and therefore cannot meet his burden to establish his entitlement to a sentence reduction on that ground alone. Specifically, in his motion, the Defendant claims to suffer from heart failure, chronic heart disease, and hypertension. Def.'s Mot. at 5. The Defendant further claims to have recently suffered a small heart attack. *Id.* at 4-5. However, according to both the medical records attached to his motion and the medical records obtained by the government, the Defendant does not suffer from his claimed medical ailments. *See* Exhibits 1 & 2.

The Defendant's medical records show that he has periodically suffered from chest pains for years, before and continuing after his entry into BOP. *See* Exhibit 2 at 3. He has received medical care for these recurrent episodes of chest pains, including numerous EKGs; however, he recently declined a left heart catheter ("LHC"). *See* Exhibit 1 at 3, 5, 68. On May 14, 2020, he reported to medical with complaints of severe and persistent chest pains. The Defendant was given an EKG which showed some abnormalities. Exhibit 1 at 16. Thereafter, he was admitted to the hospital, and the EKG given there was "unremarkable". Exhibit 1 at 50. Upon his admission to the hospital, he was tested for COVID-19 and tested positive. However, he did not present any of the common COVID-19 symptoms and did not require oxygen. Thereafter, medical staff attempted to conduct an LHC, but the Defendant refused definitive treatment. Exhibit 1 at 68. The Defendant's chest pains and symptoms subsided, and doctors ordered a stress test for a later date when the Defendant was COVID-19 negative. *Id.* On May 23, 2020, the Defendant tested negative for COVID-19. Exhibit 1 at 46. Since his admission to the hospital for chest pains in May, the Defendant has not complained of additional episodes of chest pains and remains symptom free.

The Defendant's medical records reveal that he does not have a history of cardiac disease, *see* Exhibit 1 at 15, and other than periodic complaints of chest pains, the Defendant does not suffer from any medical conditions, much less severe medical conditions that warrant his release.

Although the Defendant did test positive for COVID-19, he did not exhibit any of the normal symptoms and completely recovered. Although it is apparently possible to contract COVID-19 more than once, given the Defendant's mild symptoms and successful recovery within the correctional facility, the risk of reinfection does not warrant his release. *See, e.g.*, *United States v. Risley*, 2020 WL 4748513, at *6 (E.D. Cal. Aug. 17, 2020) ("Courts generally find that the risk of a second infection does not constitute sufficiently compelling grounds to justify compassionate release."); *United States v. Krietzman*, 2020 WL 4368191, at *3 (N.D. Cal. July 30, 2020) (Terminal Island inmate who recovered does not present extraordinary reason; "[W] have strong evidence that none of Krietzman's medical conditions would induce a more severe illness from COVID-19 since he already had an asymptomatic case of the virus."); *United States v. Adams*, 2020 WL 4505621, at *3 (S.D.N.Y. Aug. 4, 2020) ("Given Adam's apparent recovery and the minimal impact that COVID-19 appears to have had on him during his incarceration, the Court concludes that Adams has not established that his COVID-19 diagnosis, combined with his underlying health defects, will 'substantially diminish[ ] [his] ability . . . to provide self-care.'").

A thorough review of the Defendant's medical records reveals that he does not suffer from a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). To the contrary, the Defendant has received treatment for all of his claimed ailments or denied definitive treatment once his symptoms resolved. Therefore, the Defendant has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c). The motion should be denied.

**B.     The Defendant Still Poses a Significant Danger to the Safety of the Community and the § 3553(A) Factors Strongly Weigh Against His Release.**

Alternatively, the Defendant's request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors. At the present time, it is apparent that, but for the COVID-19 pandemic, the Defendant would present no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution. *See, e.g.*, *United States v. Ayon-Nunez*, 2020 WL 704785, at *3 (E.D. Cal. Feb. 12, 2020) (chronic medical conditions that can be managed in prison are not a sufficient basis for compassionate release); *United States v. Lynn*, 2019 WL 3082202 (S.D. Ala. July 15, 2019), *appeal dismissed*, 2019 WL 6273393 (11th Cir. Oct. 8, 2019) (compassionate release, sought on the basis of a variety of health ailments, is denied, as none affect the inmate's ability to function in a correctional environment); *United States v. Crawford*, 2019 WL 6615188 (M.D.N.C. Dec. 5, 2019) (66-year-old man with a variety of health conditions does not suffer from a terminal illness, the illnesses have not substantially diminished his ability to care for himself while incarcerated in the BOP, and BOP can treat the conditions; the medical conditions therefore "do not constitute extraordinary or compelling reasons warranting a sentence reduction"); *United States v. Clark*, 2019 WL 1052020, at *3 (W.D.N.C. Mar. 5, 2019) (defendant suffers from declining health, diabetes, kidney failure, and back problems requiring a walker; court holds that, even assuming the defendant is suffering from a serious physical or medical condition or deteriorating physical health due to age, she still falls short of the "extraordinary and compelling" standard because she has not demonstrated that her condition substantially diminishes her ability to provide self-care within the corrections environment or that she is not expected to recover); *United States v. Manuel*, 2020 WL 1466000 (D.S.C. Mar. 26, 2020) (defendant suffers from a chronic cardiac condition, but is able to independently manage his activities of daily living). His medical records reveal that he has been consistently monitored by medical staff since his return from the hospital, he is currently COVID-19 negative and has been since mid-May, and his chest pains have ceased. *See* Exhibits 1 & 2, 48.

The only question, then, is whether the COVID-19 pandemic changes that assessment. Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

The nature and circumstances of the offense, a gun and drug offense, do not warrant his release. On July 13, 2016, around 9:24pm, North Charleston Police Officers were dispatched to an empty lot in reference to a suspicious vehicle. Officers approached a black Buick Lacrosse in an open field. Officers first spoke to a man on foot who was walking around the property. The man stated that it was his property, and that they were sitting on the property in his friend's car. Officers then approached the driver, who got out of the driver's seat. Officers smelled marijuana coming from the car when the driver got out. Officers asked for the driver's license, later determined to be the Defendant Rashaun Judge. The Defendant stated that he was the registered owner of the car and admitted to having marijuana in his pocket. Officers searched the Defendant and found approximately 3.3 grams of marijuana in his pocket. Because he was honest, officers decided to write him a citation.

While the officer was writing the citation, the Defendant and the second man fled the scene on foot. Because officers still had the Defendant's driver's license, they decided to issue a warrant rather than run after the men. The officers then searched the car. In the driver's side door panel, officers located a purple crown royal bag containing approximately 4.3 gross grams of crack and 5.7 gross grams of cocaine, as well as a silver Charter Arms .38 special with a black handle loaded with 5 .38 Special bullets. Officers confirmed that the vehicle was registered to the Defendant. On October 10, 2016, a NCPD officer saw a silver Toyota Camry disregard a stop sign. Thereafter,

the officer conducted a traffic stop and determined that Rashaun Judge was the driver. The officer arrested the Defendant on the active warrants. The Defendant had $5,550 in his possession at the time of his arrest. The Defendant has previously been convicted for a crime punishable by a term of imprisonment exceeding on year and is therefore prohibited from possessing a firearm. The firearm and ammunition were manufactured outside of South Carolina. The drugs were lab tested and confirmed to be 3 grams of marijuana, 2.97 grams of crack, and 5.55 grams of cocaine.

The Defendant possessed a loaded firearm, which posed a danger to the community. Additionally, the Defendant possessed numerous controlled substances, indicative of drug dealing activity and further evincing his threat to the community. The Defendant possessed the firearm and controlled substances together, indicating a potential for violence in conjunction with the drug trafficking activity. Additionally, the Defendant fled the scene, putting both the officers' safety at risk, as well as the safety of those in the community. While the officer chose not to chase the Defendant, his fleeing the scene created the risk.

The history and characteristics of the Defendant, most importantly his prior federal conviction for the same conduct for which he was charged in the instant offense, weighs heavily against his release. First, the Defendant has two convictions for failure to stop for a blue light, which, in conjunction with his decision to flee the scene during the offense charged, shows that he is likely to flee law enforcement. PSR ¶¶ 18, 20. Additionally, the Defendant has two convictions for offenses involving firearms. PSR ¶¶ 18, 23. These two convictions, in combination with the firearm charge in the Indictment, demonstrate that the Defendant has the desire and ability to obtain firearms.

Moreover, the Defendant has continuously violated conditions of bond, parole, or release. Back in 2002, the Defendant was convicted on a YOA weapons charge. PSR ¶ 18. After his release,

he was arrested for a drug violation while on probation. PSR ¶ 19. In 2003, he was charged with additional drug charges and failure to stop for a blue light while on probation and while out on bond on the 2002 drug charge. PSR ¶ 20. In 2007, the Defendant was charged with robbery while out on bond on drug trafficking charges. PSR ¶ 22. The Defendant was arrested for a weapons charge in 2008 while out on bond for three drug charges, as well as a firearm charge. PSR ¶ 23. The Defendant has a controlled substance charge from 2014 and was out on bond for that charge at the time of the conduct underlying the federal indictment. PSR ¶ 4. In April 2016, he incurred a weapons charge and was on bond on those charges when he committed the underlying conduct. PSR ¶ 31. In October 2016, when he was arrested for the underlying offense, he was out on bond on three separate charges. PSR ¶ 32. The Defendant's sustained desire to engage in criminal conduct demonstrates that he is both unwilling and unable to comply with the terms and conditions of release.

Most notably, the Defendant was convicted in federal court of the exact same charges for which he serves his current sentence. Judge Duffy previously sentenced the defendant to 36 months' imprisonment after the government filed a 5K motion on his behalf. This reduced sentence was a substantial departure from the term of imprisonment he was facing. Following the term of incarceration and after numerous violations of the terms of his supervision, Judge Duffy revoked the Defendant's term of supervised release and sentenced him to prison for an additional eighteen months. The Defendant's criminal record demonstrates that he remains undeterred by federal prison. Therefore, his sentence is necessary to afford adequate deterrence and protect the public from future crimes.

Perhaps most importantly, the Defendant's conduct during his short time in BOP further demonstrates that he has not been rehabilitated but rather continues to engage in criminal activity.

16

*See* Exhibit 3. On February 27, 2020, the Defendant was found guilty of disobeying orders. *Id.* On June 5, 2020, the Defendant admitted to possessing a cell phone, 4 packs of cigarettes, and 2 cell phones chargers. *Id.* The Defendant was sentenced a little more than a year ago and has already been disciplined during that short time, evincing he has not been rehabilitated.

Although the Defendant claims to fear for his health while incarcerated, his release plan contemplates a return to "normal life" in North Charleston, SC running a car audio shop and a lawn care company. The disease is sadly rampant in South Carolina. As of this writing, there have been 130,256 confirmed COVID-19 cases, and 2,922 people have died. *See* scdhec.gov. The incident rate in Charleston County remains 168.4 per 100,000. *Id.* Currently, in the Defendant's facility, there are only 14 confirmed positive COVID-19 cases among inmates and 8 confirmed positive cases among staff members. *See* https://www.bop.gov/coronavirus/. Surely, his release into society would not reduce his risk of contracting COVID-19 under these circumstances.

Accordingly, in light of Defendant's record and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

### III.     This Court Has No Authority to Direct the BOP to Place Defendant in Home Confinement.

Defendant has also asked in the alternative that this Court order BOP to place him in home confinement to serve the remainder of his term. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States*

*v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Because the Defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But the Defendant's request to serve the rest of his term in home confinement, as opposed to prison, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. The Defendant's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because the Defendant offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.[4]

---

[4] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. *See* § 3583(e)(2).

**Conclusion**

For these reasons, this Court should deny the Defendant's motion for a sentence reduction without prejudice for failure to exhaust administrative remedies or, in the alternative, deny the motion on the merits.

                                        PETER M. MCCOY, JR.
                                      UNITED STATES ATTORNEY

By:   *s/ Emily Evans Limehouse*
        Emily Evans Limehouse
        Assistant United States Attorney
        Federal I.D. No. 12300
        Charleston, South Carolina
        Emily.Limehouse@usdoj.gov

September 15, 2020